**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Center for Biological Diversity,<br><br>Plaintiff,<br><br>v.<br><br>United States Fish and Wildlife Service,<br><br>Defendant. | No. CV-16-00527-TUC-BGM<br><br>**ORDER** |

Currently pending before the Court is Defendant United States Fish and Wildlife Service's ("Defendant" or "USFWS") Motion for Summary Judgment (Doc. 38) and Plaintiff Center for Biological Diversity's ("Plaintiff" or "CBD") [Cross-]Motion for Summary Judgment (Doc. 49). Defendant has filed a Statement of Facts Supporting Motion for Summary Judgment ("SOF") (Doc. 39), and Plaintiff has also filed a Response to Defendant's Statement of Facts in Support of their Motion for Summary Judgment ("SSOF"), as well as a Statement of Facts in Support of their Motion for Summary Judgment ("XSOF"). Each Party has responded to the opposing summary judgment motion, and subsequently replied. As such, the motion is fully briefed and ripe for adjudication.

In its discretion, the Court finds this case suitable for decision without oral argument. *See* LRCiv. 7.2(f). The Parties have adequately presented the facts and legal arguments in their briefs and supporting documents, and the decisional process would not be significantly aided by oral argument.

. . .

I.  **FACTUAL BACKGROUND**

   A.  *The Law Enforcement Management Information System Database*

USFWS is responsible for determining whether or not the imports or exports are in compliance with the laws and regulations enforced by USFWS. Def.'s SOF (Doc. 39), Hyde-Michaels Decl. (Exh. "1") at ¶ 4. This oversight and enforcement includes, but is not limited to compliance with the Endangered Species Act, 16 U.S.C. §§ 1531, *et seq. Id.* USFWS determines whether imports or exports should be allowed to enter into or depart from the United States. *Id.*

The Law Enforcement Management Information System ("LEMIS") database is used by USFWS's Office of Law Enforcement to, among other operational needs: record, process and store investigations, intelligence, import and export data, and other programmatic data.[1] *Id.*, Exh. "1" at ¶ 2. The LEMIS information is used *inter alia* to track species being imported or exported; monitor quotas of a particular species; intervene in illegal trade and the unlawful commercial exploitation of fish, wildlife, and plants; facilitation of the legal trade of fish and wildlife, and their parts and products; and to prevent the importation of invasive, injurious, or otherwise harmful species. Def.'s SOF (Doc. 39), Exh. "1" at ¶ 2.

The LEMIS data are derived from USFWS Form 3-177, the "Declaration for Importation or Exportation of Fish and Wildlife." *Id.*, Exh. "1" at ¶ 3. USFWS must clear all wildlife that are imported into or exported from the United States, irrespective of form—whether wildlife are alive, whole, in parts, or as processed products. *Id.*, Exh. "1" at ¶¶ 3–4; 50 C.F.R. § 14.52. In order to obtain clearance of such wildlife, an importer or exporter is statutorily required to file a Form 3-177. *Id.*, Exh. "1" at ¶ 5; Pl.'s SSOF (Doc. 46), Cummings Decl. (Exh. "2") at ¶ 13. Form 3-177 is similar to, but more detailed than, the United States Customs and Border Protection ("CBP") declaration forms. Def.'s SOF (Doc. 39), Exh. "1" at ¶ 3. Greater detail is demanded due to the

---

[1] CBD agrees that the LEMIS database is used to track import and export data; however, asserts that the remainder of the information is either immaterial or require discovery. The Court includes the additional information for background purposes only.

unique information USFWS is required to collect in order to make authoritative and sound judgment on whether the species of fish or wildlife is correctly identified, requires additional permits, or is in violation of any domestic or foreign law or regulation in order for the USFWS to clear the shipment for import and export. *Id.* USFWS inputs the information provided by Form 3-177 submitters into its LEMIS database. *Id.*, Exh. "1" at ¶ 6.

### B. *Prior LEMIS Data Releases by USFWS*

FOIA requests for LEMIS data by members of the public have occurred since at least 2001. Pl.'s SSOF (Doc. 46), Peyman Decl. (Exh. "4") at ¶ 7. From 2001 until approximately mid-2014 or 2015, USFWS released LEMIS data without exemption. *Id.*, Adkins Decl. (Exh. "3") at ¶¶ 11–12 & Exh. "4" at ¶ 7 & Goyenechea Decl. (Exh. "9") at ¶ 7. During the 2014 to 2015 time period, USFWS began withholding more than one (1) or two (2) fields of data from the LEMIS database. Pl.'s SSOF (Doc. 46), Cummings Decl. (Exh. "2") at ¶ 39 & Exh. "4" at ¶ 9. The withholdings varied from request to request. *See id.*, Exh. "2" at ¶ 30 (USFWS withheld quantity; customs document number; name of carrier; air waybill and bill of lading number; foreign CITES permit and U.S. permit numbers; declared value of wildlife; and foreign importer/exporter data pursuant to Exemption 4) & Exh. "3" at ¶ 12 (releasing quantity and foreign importer/exporter data) & Schubert Decl. (Exh. "5") at ¶ 4 (2015 FOIA request, response withheld U.S. importers/exporters, foreign importers/exporters, air waybill, and declared value data) & Exh. "9" at ¶ 7 (releasing quantity and foreign importer/exporter data). USFWS had previously released both quantity and foreign importer/exporter data to CBD in response to a FOIA request. *Id.*, Exh. "3" at ¶12.

### C. *CBD's Current FOIA Request*

#### 1. Original Request and Response

On February 24, 2016, Plaintiff filed a Freedom of Information Act ("FOIA") request with USFWS seeking LEMIS data for: date of import/export; port of clearance; purpose code; customs document number; name of carrier; air waybill of bill of lading

number; transportation code; number of cartons of wildlife; United States importer/exporter; foreign importer/exporter; scientific and common name of species; foreign Convention on International Trade in Endangered Species of Wild Fauna and Flora ("CITES") permit and United States permit numbers; description code; source code; country of origin; quantity/unit, and declared value. Pl.'s Opp. to Mot. to Intervene (Doc. 28), Uhlmann Decl., CBD FOIA Request 2/24/2016 (Exh. "A") at 1–2; Def.'s SOF (Doc. 39), Hyde-Michaels Decl. (Exh. "1") at ¶ 2. In response to this request, USFWS provided the following LEMIS data fields: species; wildlife description; number of cartons; country of origin; country of import/export; purpose of import/export; source; dates; ports of clearance; transportation code; and name of United States importer/exporter. *See* Pl.'s Opp. to Mot. to Intervene (Doc. 28), Uhlmann Decl., USFWS Response to CBD's FOIA Request 3/4/2016 (Exh. "B") at 2. Pursuant to FOIA Exemption 4, which exempts confidential commercial information, USFWS withheld LEMIS data fields containing: declared value; quantity; foreign importer/exporter; name of carrier; bill of lading number; customs document number; and permit number. *Id.*, Uhlmann Decl., Exh. "B" at 2. On April 8, 2016, CBD appealed USFWS's decision to withhold the following LEMIS data fields: declared value; quantity; foreign importer/exporter; bill of lading number; customs document number; and permit numbers. *Id.*, Uhlmann Decl., CBD FOIA Appeal 4/8/2016 (Exh. "C") at 2. USFWS did not respond to CBD's FOIA appeal within twenty (20) days. Answer (Doc. 35) at ¶ 9.

### 2. The Instant Litigation

On August 9, 2016, CBD filed the instant litigation to challenge the Exemption 4 withholdings. *See* Compl. (Doc. 1). On November 25, 2016, USFWS noticed the submitters of LEMIS data through a notice (the "Notice") in the Federal Register on November 25, 2016 (81 Fed. Reg. 85255) and pursuant to 43 C.F.R. 2.27(b). Def.'s SOF (Doc. 39), Hyde-Michaels Decl. (Exh. "1") at ¶ 11. The Notice solicited views from submitters of Form 3-177 regarding the Exemption 4 data and contained instructions for submitters, as well as apprised them of the legal standards applicable in this case. *Id.*

Ultimately, approximately thirty-two (32) submitter companies were deemed by USFWS to have provided sufficient information, and warranted exemption. *Id.*, Exh. "1" at ¶ 14. During this litigation USFWS and CBD negotiated a rolling release of all data that USFWS had deemed not subject to exemption. *Id.*, Exh. "1" at ¶ 21. USFWS has provided CBD with all relevant information, except for the Exemption 4 information that is currently the subject of this litigation. *Id.* Through this litigation CBD seeks the release of the following data fields: 1) foreign importer/exporter; 2) United States permit number; 3) quantity; and 4) name of carrier. Pl.'s SSOF (Doc. 46), Cummings Decl. (Exh. "3") at ¶ 31.

## II. STANDARD OF REVIEW

"The Freedom of Information Act was enacted to facilitate public access to Government documents." *United States Dep't of State v. Ray*, 502 U.S. 164, 173, 112 S.Ct. 541, 547, 116 L.Ed.2d 526 (1991) (citations omitted). "The statutory scheme provides public access to government information 'shielded unnecessarily' from the public and establishes a 'judicially enforceable public right to secure such information from possibly unwilling official hands.'" *Watkins v. United States Bureau of Customs and Border Protection*, 643 F.3d 1189 (9th Cir. 2011) (quoting *Department of Air Force v. Rose*, 425 U.S. 352, 361, 96 S.Ct. 1592, 48 L.Ed.2d 11 (1976)). "The basic purpose of FOIA is to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed." *N.L.R.B. v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242, 96 S.Ct. 2311, 2327, 57 L.Ed.2d 159 (1978) (citations omitted).

"At the same time, FOIA contemplates that some information may legitimately be kept from the public." *Lahr v. NTSB*, 569 F.3d 964, 973 (9th Cir. 2009). Accordingly, FOIA contains nine exemptions pursuant to which information can be withheld. *See* 5 U.S.C. § 552(b)(1)–(9). "FOIA's 'strong presumption in favor of disclosure' means that an agency that invokes one of the statutory exemptions to justify the withholding of any

requested documents or portions of documents bears the burden of demonstrating that the exemption properly applies to the documents." *Lahr*, 569 F.3d at 973 (quoting *Ray*, 502 U.S. at 173, 112 S.Ct. 541). Furthermore, "[b]ecause of its overarching goal of public disclosure, FOIA 'exemptions are to be interpreted narrowly.'" *Watkins*, 643 F.3d at 1194 (quoting *Lahr*, 569 F.3d at 973).

"Most FOIA cases are resolved by the district court on summary judgment, with the district court entering judgment as a matter of law." *Animal Legal Defense Fund v. United States Food & Drug Admin.*, 836 F.3d 987, 989 (9th Cir. 2016) (citations omitted). The Ninth Circuit Court of Appeals has "conclude[d] there is no principled distinction to be drawn between [its] usual summary judgment standard and the standard to be applied in FOIA cases." *Id.* Accordingly, summary judgment is appropriate when, viewing the facts in the light most favorable to the nonmoving party, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986), "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law," and a dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510. Thus, factual disputes that have no bearing on the outcome of a suit are irrelevant to the consideration of a motion for summary judgment. *Id*.

**III. ANALYSIS**

    *A. Exemption 4*

FOIA exempts "trade secrets and commercial or financial information obtained from a person and privileged or confidential" from disclosure. 5 U.S.C. §552(b)(4). "In order to invoke Exemption 4 in the Ninth Circuit, the government agency must demonstrate that the information it sought to protect is '(1) commercial and financial information, (2) obtained from a person or by the government, (3) that is privileged or

confidential.'" *Watkins v. United States Bureau of Customs and Border Protection*, 643 F.3d 1189, 1194 (9th Cir. 2011) (quoting *GC Micro Corp. v. Defense Logistics Agency*, 33 F.3d 1109, 1112 (9th Cir. 1994)). "The terms 'commercial or financial' are given their ordinary meaning. *Id.* (citing *Pub. Citizen Health Research Group v. FDA*, 704 F.2d 1280, 1290 (D.C. Cir. 1983)). "[C[ommercial or financial matter is 'confidential' for purposes of the exemption if disclosure of the information is likely to have either of the following effects: (1) to impair the Government's ability to obtain necessary information in the future; or (2) to cause substantial harm to the competitive position of the person from whom the information was obtained." *Id.* (quoting *GC Micro Corp.*, 33 F.3d at 1112).

It is undisputed that the information collected in the LEMIS database is compelled due to the mandatory nature of the Form 3-177. "[T]here is a presumption that the Government's interest is not threatened by disclosure because it secure[d] the information by mandate; and as the harm to the private interest (commercial disadvantage) is the only factor weighing against FOIA's presumption of disclosure, that interest must be significant." *Critical Mass Energy Project v. Nuclear Regulatory Comm'n*, 975 F.2d 871, 878 (D.C. Cir. 1992) (en banc); *cf. Frazee v. United States Forest Service*, 97 F.3d 367, 372 (9th Cir. 1996) (although the Ninth Circuit has not addressed the *Critical Mass* distinction, recognizing that "[i]f the information is required by the government, then the substantial competitive harm prong of the *National Parks* confidentiality test still applies."). "Competitive harm should not be taken to mean simply any injury to the competitive position[.]" *Watkins*, 643 F.3d at 1195 (citations omitted). Moreover, "[a]lthough the court need not conduct a sophisticated economic analysis of the likely effects of disclosure[,] . . . [c]onclusory and generalized allegations of substantial competitive harm . . . are unacceptable and cannot support an agency's decision to withhold requested documents." *Id.* (quotations and citations omitted) (first alteration added). "The government need not show that releasing the documents would cause 'actual competitive harm.'" *Id.* at 1194 (citing *GC Micro Corp.*, 33 F.3d at 1113).

"Rather, the government need only show that there is (1) actual competition in the relevant market, and (2) a likelihood of substantial competitive injury if the information were released." *Id.*

### B. *Substantial Competitive Injury*

For purposes of this motion, the Court assumes without deciding that the data at issue is commercial information protected by Exemption 4. Additionally, the court will assume without deciding that each objector can demonstrate actual competition in the relevant market.[2] A review of the 2014 and 2015 data originally released by USFWS to CBD indicates that the LEMIS data regarding the objecting companies, and for which no Exemption has been claimed, was disclosed. Pl.'s SSOF (Doc. 46), Cummings Decl. (Exh. "3") at ¶ 30 & Attach. "C." As such, the Court limits its review of each objector's assertions regarding the likelihood of substantial competitive injury to the four (4) fields sought by CBD.

### 1. Charles River

Charles River alleges that "[t]he information in the LEMIS 'Quantity' filed would allow competitors to calculate the level of business being conducted by competing importers and exporters[,] . . . [and] allow them (in conjunction with other information they already possess) to calculate import and export volumes and prices being paid by competing importers and exporters." Def.'s SOF (Doc. 39), Name Redacted Decl. (Exh. "3") at ¶ 14(b). Regarding foreign importer/exporter data, Charles River alleges that "[r]elease of this information allows competitors to identify our foreign suppliers as well as our foreign customers and approach them seeking to offer or purchase animals at a more attractive price." *Id.*, Exh. "3" at ¶ 14(g). Charles River offers a general objection regarding release of the United States permit number, and does not address the carrier data. *Id.*, Exh. "3" at ¶ 14(h).

---

[2] "Competitive harm analysis 'is . . . limited to harm flowing from the affirmative use of proprietary information by *competitors*. Competitive harm should not be taken to mean simply any injury to competitive position . . . .'" *Watkins v. United States Bureau of Customs and Border Protection*, 643 F.3d 1189, 1195 (9th Cir. 2011) (quoting *Pub. Citizen Health Research Group v. FDA*, 704 F.2d 1280, 1291–92 & n.30) (alterations in original).

### 2. Bristol-Myers Squibb

Bristol-Meyers Squibb ("BMS") urges that the name of carrier, foreign importer/exporter with country code, and United States permit numbers "must be withheld in order to prevent a substantial likelihood of competitive harm from disclosing the identity of BMS's vendors." Def.'s SOF (Doc. 39), Graziano Decl. (Exh. "4") at ¶ 9. BMS argues that because competition for reliable vendors is acute, and "competitors vie for the same limited resources," those competitors could decide that BMS's vendors provide superior products or services and switch to BMS's vendors. *Id.*, Exh. "4" at ¶ 10. BMS extends this argument to the supply route and supply chain. *Id.* "BMS would then be disadvantaged in that it would likely be forced to pay higher prices for specimens or receive inferior service or quality than it now does because the quality of specimens it currently sources from its preferred suppliers may become scarce." *Id.* Finally, BMS argues that the quantity of specimens in conjunction with the number of cartons and monetary value "could lead to direct inferences about the amount of certain types of research the company conducts, leading competitors to respond by increasing their research or adjusting their research timelines in an effort to beat BMS to market." *Id.*, Exh. "4" at ¶ 15.

### 3. Covance Laboratories, Inc.

Covance Laboratories claims that "[t]he release of the information sought by CBD will cause substantial financial harm to Covance's business interests[,] . . . [and] will provide competitors with a comprehensive picture of Covance's business interests as a whole. Def.'s SOF (Doc. 39), Harkness Decl. (Exh. "5") at ¶ 6. Covance further alleges that if its "competitors know which vendors an industry leader such as Covance patronize, they could decide, as Covance has, that these vendors provide superior services and/or research animals and therefore patronize these same vendors . . . [and Covance] would likely be forced to pay higher prices for animals or receive inferior service or quality because resources it currently sources from its preferred suppliers may become scarce." *Id.*, Exh. "5" at ¶¶ 8–9. Covance also express concern that "[t]he release of

airlines used, in conjunction with the names of the exporters, could considerably impact Covance's business by allowing rival importers to reverse-engineer Covance's business model and discover advantages that it provides." *Id.*, Exh. "5" at ¶ 11. Covance further alleges that it would suffer substantial competitive harm if competitors knew the quantities and unit numbers of imported animals, because the competitor could then learn Covance's capacity to house a certain number of primates and undercut their prices. *Id.*, Exh. "5" at ¶ 13.

### 4. AbbVie, Inc.

AbbVie alleges that it would be harmed if the LEMIS data were released, because a competitor could look at the LEMIS fields for importer/exporter and quantity and identify AbbVie's suppliers and ascertain its import volumes. Def.'s SOF, Name Redacted Decl. (Exh. "6") at ¶ 18. AbbVie also alleges that its "competitors could use LEMIS data to figure out and take advantage of our shipping arrangements, causing delay and supply chain disruption." *Id.*, Exh. "6" at ¶ 19. AbbVie asserts that permit numbers "can be used to determine country of origin, revealing clues to airline routes, potential airline carriers, or other information that can be used to disrupt supply chain." Def.'s Reply (Doc. 61), Name Redacted Decl. (Exh. "4") at ¶ 3. AbbVie further asserts that release of quantity information "will enable competitors to effectively target major importers and largest part of our supply line[,]" as well as reveal market share. *Id.*, Exh. "4" at ¶¶ 4–5.

### 5. Alnylam Pharmaceuticals

Alnylam Pharmaceuticals asserts that release of the foreign importer/exporter, name of carrier, and United States permit numbers could enable "competitors to identify a company's vendors and/or suppliers of research specimens or other research services relating to such specimens[.]" Def.'s Reply (Doc. 61), DeLena Decl. (Exh. "5") at ¶ 5. Alnylam further alleges that "[q]uantity information could lead to direct inferences regarding the phase and scope of product research and development in Alnylam's pipeline." *Id.*, Exh. "5" at ¶ 6.

### 6. Quality Marine

Quality Marine asserts that quantity data would "provide trade volume by species/subspecies and provide[] competitors trade information they can utilize to undermine [its] relationships not only without suppliers, but also our customers." Def.'s SOF (Doc. 39), Buerner Decl. (Exh. "8") at ¶ 16(b). Quality Marine further asserts that release of foreign importer/exporter information would provide "competitors the ability to determine who our foreign suppliers are as well as identify our foreign clients" and approach either of them to the detriment of Quality Marine. *Id.*, Exh. "8" at ¶ 16(h).

### 7. Animal Source Texas, Inc.

Animal Source Texas, Inc. ("AST") broadly asserts that disclosure of the LEMIS data could result in competitors attempting to gain an advantage by utilizing AST's sources or suppliers. Def.'s SOF (Doc. 39), Stojadinov Decl. (Exh. "9") at ¶¶ 17–18, 22–23. AST further asserts that competitors could use information regarding a rare species supplier to obtain new clients at AST's expense. *Id.*, Exh. "9" at ¶ 24.

### 8. Worldwide Primates, Inc.

Worldwide Primates, Inc. ("WWP") asserts that air carrier arrangements represent "[o]ne of the most vital, sensitive, and protected components." Def.'s SOF (Doc. 39), Block Decl. (Exh. "10) at ¶ 8. WWP alleges that release of carrier information and foreign importer/exporter information will result in significant financial harm due to competitors taking advantage of the information. *Id.*, Exh. "10" at ¶¶ 12, 15. WWP admits that some of this information may be publicly available. *Id.*, Exh. "10" at ¶ 21.

### 9. Boehringer Ingelheim Pharmaceuticals, Inc.

Boehringer Ingelheim Pharmaceuticals, Inc. ("Boehringer Ingelheim") asserts that the name of the carrier, foreign importer/exporter, and United States permit numbers "must be withheld in order to prevent a substantial likelihood of competitive harm from disclosing the identity of Boehringer Ingelheim's vendors." Def.'s SOF (Doc. 39), Baxter Decl. (Exh. "11) at ¶ 9. Boehringer Ingelheim asserts that competitors could use information that identifies vendors to determine the kind of tests Boehringer Ingelheim

may be pursuing or switch to Boehringer Ingelheim's vendors to its detriment. *Id.*, Exh. "11" at ¶ 10. Boehringer Ingelheim further expresses concerns that such information would "give competitors insights into the company's potential negotiating positions with such vendors." *Id.* Boehringer Ingelheim also alleges that the disclosure of the quantity of specimens "could be used to provide information to competitors regarding the degree of activity in Boehringer Ingelheim's research [and] development pipeline." *Id.*, Exh. "11" at ¶ 14.

### 10. Bogner of America, Inc.

Bogner of America, Inc. ("Bogner of America") objects to the release of LEMIS data because it will cause "substantial financial harm to Bogner of America's business interests[,] [and] . . . will provide competitors with a comprehensive picture of Bogner of America's business interests as a whole." Def.'s SOF (Doc. 39), Brandsetter Decl. (Exh. "12") at ¶ 9. Bogner of America expresses concern that "vendors may decide to increase their prices if there is heightened demand for their services from more retailers—leading to substantial competitive harm for Bogner of America's business interests." *Id.*, Exh. "12" at ¶ 10.

### 11. DM Exotics

DM Exotics objections are based on issues surrounding the actual cost of what she imports, information regarding which CBD does not seek. *See* Def.'s SOF (Doc. 39), Mulleary Decl. (Exh. "13").

### 12. Exotic Reef Imports, Inc.

Exotic Reef Imports, Inc. ("ERI") asserts that the release of foreign importer/exporter information will result in substantial financial harm, because competitors could discern ERI's suppliers and breeders. Def.'s SOF (Doc. 39), Miller Decl. (Exh. "14") at ¶ 17. ERI further asserts that disclosure of the United States permit number "could be used to cross-reference to information related to species, country of origin and quantities imported and allow [ERI's] competitors to discern specific information about the marine aquarium wholesale work . . . and could use such

information to improperly compete against and harm ERI." *Id.*, Exh. "14" at ¶ 19. ERI further admits that "some of this information might be publicly available from some other source[.]" *Id.*, Exh. "14" at ¶ 24.

### 13. Safari Specialist Inc. d/b/a/ True-Life Taxidermy

Safari Specialist Inc. d/b/a/ True-Life Taxidermy ("SSI") asserts that "[t]he disclosure of import/export quantity reveals SSI's overseas taxidermy market share and the primary locations where SSI conducts business, which would allow its competitors to target clients and suppliers in those areas." Def.'s Reply (Doc. 61), Vitro Decl. (Exh. "11") at ¶ 10.

### 14. SNBL

SNBL asserts that disclosure of foreign importer/exporter information "will result in substantial financial harm to SNBL as such information would easily lead SNBL's competitors to discern the breeders [with whom] SNBL contracts[.]" Def.'s SOF (Doc. 39), Glaza Decl. (Exh. "16") at ¶ 17. SNBL acknowledges "that some of this information might be publicly available[.]" *Id.*, Exh. "16" at ¶ 24.

### 15. Genentech, Inc.

Genentech, Inc. ("Genentech") asserts that release of foreign importer/exporter and United States permit numbers could result in Genentech's competitors identifying its vendors, and using their services to Genentech's commercial disadvantage. Def.'s SOF (Doc. 39), Chan. Decl. (Exh. "17") at ¶ 9. Genentech's objections to the release of quantity data only relate to its release with monetary value. *Id.*, Exh. "17" at ¶ 14.

### 16. Novartis Pharmaceuticals Corporation

Novartis Pharmaceuticals Corporation includes Novartis Institutes for BioMedical Research, Inc. ("NIBRI") and Novartis Institute for Functional Genomics, Inc., d/b/a the Genomics Institute of the Novartis Research Foundation ("GNF") (collectively, "Novartis"). Def.'s SOF (Doc. 39), Bouchard Decl. (Exh. "18") at ¶ 1 & Name Redacted Decl. (Exh. "19"). Novartis asserts that release of foreign importer/exporter and United States permit numbers could allow competitors to identify vendors, and use them to

- 13 -

Novartis's disadvantage. *Id.*, Exh. "18" at ¶¶ 9–10 & Exh. "19" at ¶¶ 9–10. Novartis further alleges that the LEMIS data would disclose what was in the pipeline, because when Novartis "publicizes product pipeline information at all, it is usually only general information regarding [its] research approaches, product discovery methodologies, and certain projects in active clinical development." Def.'s Reply (Doc. 61), Name Redacted Decl. (Exh. "11") at ¶ 8. Novartis also states that quantity data alone "could provide a roadmap regarding [its] research efforts, enabling competitors to make direct inferences about the amount of certain types of research NPC has conducted and continues to perform." *Id.*, Exh. "11" at ¶ 9.

### 17. Burberry

Burberry Limited and Burberry (Wholesale) Limited (collectively "Burberry") asserts that release of the LEMIS data "will provide competitors with a comprehensive picture of Burberry's business interests as a whole. Def.'s SOF (Doc. 39), Ahmetaj Decl. (Exh. "20") at ¶ 9. Burberry further alleges that such a release would reveal the identity of its vendors and carriers, which would result in increased competition for scarce resources. *Id.*, Exh. "20" at ¶ 9–10.

### 18. Primate Products

Primate Products ("PP") asserts that release of carrier information will result in PP's competitors being able to take advantage of the relationships it has cultivated. Def.'s SOF (Doc. 39), Rowell Decl. (Exh. "21") at ¶13. Similarly, PP asserts that release of foreign importer/exporter information will allow competitors to identify sources of PP purchases, and gain an unfair competitive advantage. *Id.*, Exh. "21" at ¶ 16. PP acknowledges that "some of this information may be publicly available[.]" *Id.*, Exh. "21" at ¶ 21.

### 19. Appropriateness of Exemption

Each of the entities who have urged confidentiality have broadly stated the possibility of competitive harm if the LEMIS data were released. In this case, however, LEMIS data has been released in full for more than a decade prior to USFWS redacting

- 14 -

any information. Once USFWS began redacting fields, it did so without any sort of consistency. Neither has USFWS presented a change of policy, circumstance, or statute that might explain its uneven responses to FOIA requests.

Based on the circumstances of this case, the corporate speculations are insufficient to support exemption. "Competitive harm should not be taken to mean simply any injury to the competitive position[.]" *Watkins*, 643 F.3d at 1195 (citiations omitted). Moreover, "[a]lthough the court need not conduct a sophisticated economic analysis of the likely effects of disclosure[,] . . . [c]onclusory and generalized allegations of substantial competitive harm . . . are unacceptable and cannot support an agency's decision to withhold requested documents." *Id.* (quotations and citations omitted) (first alteration added). If there were a true *likelihood* of *substantial* competitive injury, at least one instance of harm would have been documented based on the years of unredacted LEMIS data release. USFWS has not met "its burden of showing a potential of substantial competitive harm." *GC Micro Corp. v. Defense Logistics Agency*, 33 F.3d 1109, 1115 (9th Cir. 1994). As such, USFWS has not overcome FOIA's strong presumption in favor of disclosure. *Lahr v. NTSB*, 569 F.3d 964, 973 (9th Cir. 2009). CBD is entitled to a dataset including the Exemption 4 information at issue. As such, summary judgment

### C. Administrative Procedures Act

Defendant seeks dismissal of Plaintiff's APA claim requesting an order directing disclosure under the APA. Def.'s Mot. for Summ. J. (Doc. 38) at 14–15. "The Ninth Circuit recognizes: '[I]f a plaintiff can bring suit against the responsible federal agencies under [a citizen-suit provision], this action precludes an additional suit under the APA.'" *Lion Raisins, Inc. v. United States Dept. of Agriculture*, 636 F.Supp.2d 1081, 1114–15 (9th Cir. 2009) (quoting *Berm-Air Disposal v. Cohen*, 156 F.3d 1002, 1005 (9th Cir. 1998)) (alterations in original). "The FOIA contains a citizen-suit provision[,] . . . and it provides [Plaintiff] with another adequate remedy." *Id.* at 1115. Because FOIA provides an adequate remedy, Defendant's motion to dismiss Plaintiff's APA claim is granted.

. . .

### D. *Agency Appeal*

Defendant also seeks summary judgment on "Plaintiff's claim for an order compelling USFWS to respond to Plaintiff's appeal." Def.'s Mot. for Summ. J. (Doc. 38) at 15. "The deciding official for FOIA appeals normally will not make a decision on an appeal if the request becomes a matter of FOIA litigation." 43 C.F.R. 2.60(d). CBD sued in order to obtain relief pursuant to USFWS's failure to respond to its FOIA appeal. CBD has obtained the relief that it sought under FOIA, and the Court declines to issue a declaratory ruling regarding USFWS's appellate process. Accordingly, Defendant is entitled to summary judgment on this claim.

### E. *Motion to Strike and 56(d) Relief*

Plaintiff sought to strike portions of Defendant's factual statements, or in the alternative sought relief pursuant to Rule 56(d), Federal Rules of Civil Procedure. In light of the foregoing, Plaintiff's motions are denied as moot.

## IV. CONCLUSION

Based upon the foregoing, the Court finds that Defendant failed to meet "its burden of showing a potential of substantial competitive harm." *GC Micro Corp. v. Defense Logistics Agency*, 33 F.3d 1109, 1115 (9th Cir. 1994). Accordingly, IT IS HEREBY ORDERED that:

1) Defendant's Motion for Summary Judgment (Doc. 38) is DENIED in part and GRANTED in part;

2) Plaintiff's Cross-Motion for Summary Judgment (Doc. 49) is GRANTED in part and DENIED in part;

3) Defendant shall provide documents responsive to Plaintiff's FOIA request consistent with this Order within fourteen (14) days of this Order;

4) Plaintiff's claim pursuant to the APA is DISMISSED;

5) Plaintiff's motion to strike and for 56(d) relief is DENIED AS MOOT; and

. . .

6) The Clerk of the Court shall enter judgment in favor of the Plaintiff and close the case.

Dated this 30th day of March, 2018.

Honorable Bruce G. Macdonald
United States Magistrate Judge